UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNIVERSAL STANDARD INC.,                          :

         Plaintiff,                                :

                                                :

       -v.-                                           :

TARGET CORPORATION, et al.,                       :

         Defendants.                           :
-----------------------------------------------------------------X

OPINION & ORDER

18 Civ. 6042 (GWG)

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      This trademark infringement suit brought by a clothing company, Universal Standard,

Inc. ("Universal Standard") against Target Corporation ("Target") raises the question of whether

sharing attorney-client privileged communications with a public relations firm destroys that

privilege. Target asks this Court to rule that the communications, which are in the form of

emails, are neither privileged nor protected by the attorney work-product doctrine.[1] For the

reasons that follow, we find that any privilege that attached to the emails was waived because the

public relations firm took part in the email exchanges. We also find that Universal Standard has

not met its burden of showing work product protection. Accordingly, Target's motion is

granted.

---

[1] See Letter from Brendan J. O'Rourke, filed Feb. 21, 2019 (Docket # 88); Letter from
Brendan J. O'Rourke, filed Feb. 22, 2019 (Docket # 90) ("Def. Letter Motion"); Plaintiff
Universal Standard Inc's Opposition to Target's Motion Regarding the Privileged BrandLink
Documents (ECF No. 88), filed Feb. 26, 2019 (Docket # 92) ("Pl. Opp."); Defendants' Reply
Memorandum of Law in Further Support of Their Motion for Resolution of Plaintiff's Improper
Privilege Assertion Over Certain Documents Produced by Third Party BrandLink, filed Mar. 7,
2019 (Docket # 99) ("Def. Reply"); Declaration of Lee M. Popkin in Further Support of
Defendants' Motion for Resolution of Plaintiff's Improper Privilege Assertion Over Certain
Documents Produced by Third Party BrandLink, filed Mar. 7, 2019 (Docket # 100) ("Popkin
Decl.").

# I. BACKGROUND

## A.  The Underlying Litigation

In 2014, Polina Veksler and Alexandra Waldman co-founded Universal Standard, a start-up company and "size-inclusive clothing brand," in response to the "serious lack of well-made, modern, women's apparel in inclusive sizes."  Declaration of Polina Veksler (annexed as Docket # 92-3 to Pl. Opp.) ("Veksler Decl."), ¶¶ 2-3; Pl. Opp. at 2.  According to the operative complaint in this case, Universal Standard has used its federally-registered "Universal Standard" trademark "as a source-identifier for its products" since 2015.  Second Amended Complaint, filed Sept. 18, 2018 (Docket # 42) ("SAC"), ¶¶ 9-10.  To that end, Universal Standard has designed its own fabrics and clothing and created a line of "signature jeans" based on "insight and customer knowledge," with the goal of creating a "size-inclusive" tailored collection.  Id. ¶¶ 11-12.  Universal Standard's products can be purchased on its and Nordstrom's websites, as well as in showrooms and stores.  Id. ¶ 15.

On July 3, 2018, Universal Standard brought this suit against Target and 10 unknown individuals or entities for trademark infringement and unfair competition under the Lanham Trademark Act, 15 U.S.C. §1051 et seq., and also asserted related state law claims.  See Complaint, filed July 3, 2018 (Docket # 1).  Universal Standard alleges that Target willfully infringed upon the Universal Standard mark by offering for sale its own line of women's clothing called "Universal Thread," and unlawfully using Universal Standard's "brand concept" by stating that Target's designers "go to 'great lengths to perfect every fit, in every piece, in every size.'"  SAC ¶¶ 17-18.  Universal Standard alleges that Target's sale of the Universal Thread line of clothing will cause consumers to believe Target's Universal Thread items are made by, associated with, or approved by Universal Standard.  Id. ¶ 20.  Universal Standard

alleges that this market confusion will cause individuals to mistake Target's line of clothing for the "genuine high-quality Universal Standard products," which will damage its reputation.  Id. ¶¶ 20, 22-23.

B.  The Dispute

The dispute here involves emails sent in June 2018 among Universal Standard, its attorneys, and BrandLink.  The dispute first arose at the February 1, 2019, deposition of Jason Rappaport, Universal Standard's Chief of Staff and in-house counsel.  Pl. Opp. at 1, 5; see Transcript of Videotape Deposition of Jason Rappaport, dated Feb. 1, 2019 (annexed as Ex. F to Def. Letter Motion, Docket # 90-6) ("Rappaport Dep.").  During the deposition, counsel for Target began questioning Rappaport about the emails.  See Rappaport Dep. at 130-131.  In response, Brent K. Blakely, counsel for Universal Standard, halted the questioning and took the position that the emails were privileged.  See id. at 130-31, 136, 140; Declaration of Brent H. Blakely Esq. in Support of Plaintiff Universal Standard Inc's Opposition to Target's Motion Regarding the Privileged BrandLink Documents (ECF No. 88) (annexed to Pl. Opp., Docket # 92-1) ("Blakely Decl."), ¶ 5.  After the deposition, Blakely wrote defense counsel that Target was under an affirmative obligation to "[r]eturn, sequester, or destroy" the subpoenaed documents because they were protected by attorney-client privilege.  See, e.g., Email message from Brent Blakely, sent Feb. 1, 2019 (annexed as Ex. 3 to Pl. Opp., Docket # 92-2) (quoting Fed. R. Civ. P. 45(e)(2)(B)); see also Blakely Decl. ¶¶ 6-10.

In his declaration, Blakely identified the emails at issue as being contained in email chains from June 19-25, 2018, and June 26-27, 2018.  Blakely Decl. ¶ 12; Pl. Opp. at 15; see also Def. Reply at 1 n.1 (the communications at issue "include multiple emails and documents that are part of at least two email chains").  After briefing on this motion was completed, the Court

required production of the emails and has reviewed them in camera.

Target argues (1) that Universal Standard waived any privilege as to the emails by failing to adequately describe the communications on its initial privilege log, Def. Letter Motion at 2; (2) that any attorney-client privilege was waived when the documents were voluntarily "disclosed to third-party BrandLink," id. at 3; and (3) that the communications are not protected attorney work-product, Def. Reply at 14-15.[2]  Universal Standard opposes these arguments, contends that the emails are not relevant, and suggests that Target did not act properly after receiving the subpoenaed documents.  Pl. Opp. at 7-21.  We address these arguments below.

II. DISCUSSION

A. Relevance

As an initial matter, we address Universal Standard's argument that the emails are not relevant.  See Pl. Opp. at 13-14.  Rule 26 of the Federal Rules of Civil Procedure provides that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1); accord John Wiley & Sons, Inc. v. Book Dog Books, LLC, 298 F.R.D. 184, 186 (S.D.N.Y. 2014); see Dynacore Holdings Corp. v. U.S. Philips Corp., 2002 WL 31233246, at *2 (S.D.N.Y. Oct. 4, 2002).  Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the

---

[2] Target originally requested that the Court "order Universal Standard to produce . . . any additional communications it has withheld that were disclosed to BrandLink."  Def. Reply at 2 (referring to "one additional email chain on which BrandLink was copied, dated Feb 13-15, 2018," that Universal Standard "withheld").  However, this request was based on an erroneous entry in Universal Standard's privilege log and in fact there are no additional documents involving BrandLink being withheld.  See Joint Letter from Tiffany M. Woo and Brent H. Blakely, dated Mar. 22, 2019 (Docket # 127).

4

action."

This case is unusual because the disputed documents have already been produced and thus, as a practical matter, as long as one of the emails is relevant, we are obliged to reach Target's claim that it should not be forbidden to use at least that email based on Universal Standard's claim of privilege and work product protection. Having examined the documents, we view at least one (if not more) of the emails as satisfying the relevance standard. Specifically, we note that one email message expresses the view of the co-founder of Universal Standard as to how Target has caused consumer confusion. <u>See</u> Email message from Alexandra Waldman, sent June 19, 2018 ("BRAND_0027"). Accordingly, we reject Universal Standard's argument that Target's motion should be denied because none of the documents are relevant.

B. <u>Waiver Based on Deficient Privilege Log</u>

Target argues that Universal Standard waived any privilege by failing to adequately identify the disputed communications on its privilege log. <u>See</u> Def. Letter Motion at 2-3. While the email chains were included on the privilege log, <u>see</u> Plaintiff's Privilege Log (annexed as Ex. 1 to Pl. Opp., Docket # 92-2), at 12-13, the names of the BrandLink employees were omitted, thus making it impossible for Target to see from the privilege log that there was a potential argument regarding waiver of attorney-client privilege due to the involvement of BrandLink employees in the email exchanges.

Local Rule 26.2 requires a party asserting privilege to create a log that contains a description of, <u>inter</u> <u>alia</u>, any sender or recipient of a document. Local Rule 26.2(a)(2)(A)(iv). It also requires a description, where not already "apparent," of "the relationship of the author, addressees, and recipients to each other." <u>Id.</u> "Withholding privileged materials without including the material in a privilege log 'may be viewed as a waiver of the privilege or

protection.'" Dey, L.P. v. Sepracor, Inc., 2010 WL 5094406, at *2 (S.D.N.Y. Dec. 8, 2010) (quoting Fed. R. Civ. P. 26 Advisory Committee Notes); see Chevron Corp. v. Donziger, 2013 WL 4045326, at *2-3 (S.D.N.Y. Aug. 9, 2013) (citing cases). The same principle applies to the omission of critical information that would allow for a challenge to a claim of privilege. See Weiss v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 66 (E.D.N.Y. 2007) ("Failing to include sufficiently descriptive information may result in waiver of the privilege.") (citing cases); accord McNamee v. Clemens, 2014 WL 1338720, at *4-5 (E.D.N.Y. Apr. 2, 2014) (privileges were waved where privilege log was found to be deficient due to "vague" log entries); Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C., 499 F. Supp. 2d 475, 478-79 (S.D.N.Y. 2007) (waiver for deficient privilege log that "often [did] not identify the parties to the communication" or "which privilege [was] being asserted"); OneBeacon Ins. Co. v. Forman Int'l, Ltd., 2006 WL 3771010, at *7 (S.D.N.Y. Dec. 15, 2006); Allstate Life Ins. Co. v. First Tr. Nat. Ass'n, 1993 WL 138844, at *2-3 (S.D.N.Y. Apr. 27, 1993).

However, "[i]t has been observed that 'only "flagrant" violations of these rules should result in a waiver of privilege.'" Dey, L.P., 2010 WL 5094406, at * 2 (quoting Pern-America, Inc. v. Sunham Home Fashions, LLC, 2007 WL 3226156, *2 (S.D.N.Y. Oct. 31, 2007)). "Whether waiver is warranted depends on such factors as the length of the delay, the willfulness of the transgression, and the harm to other parties." Id. (citing Schiller v. City of New York, 245 F.R.D. 112, 118 (S.D.N.Y. 2007); accord Tiger Capital, LLC v. PHL Variable Ins. Co., 2013 WL 4517267, at *2 (S.D.N.Y. Aug. 26, 2013); In re Air Crash Near Clarence Ctr., New York, on Feb. 12, 2009, 2013 WL 12320751, at *2 (W.D.N.Y. Aug. 23, 2013); Am. Intl Specialty Lines Ins Co. v. Connecticut Res. Recovery Auth., 2012 WL 13018418, at *3 (D. Conn. Mar. 6, 2012); Univ. Sports Publications Co. v. Playmakers Media Co., 2011 WL 1143005, at *3 (S.D.N.Y.

Mar. 21, 2011).

The emails in question include emails involving, either as a sender or recipient, Devin Tucker and Amy Clark, who are employees of BrandLink. <u>See</u>, <u>e.g.</u>, Email message from Alexandra Waldman to Devin Tucker, sent June 19, 2018 ("BRAND_0027"); Email message from Amy Clark to Jason Rappaport, sent June 26, 2018 ("BRAND_0045"). Universal Standard's attorney states that the omission of the names of the two BrandLink employees was "inadvertent[]" because "in email correspondence with Brandlink, Universal Standard uses the following email address: . . . universalstandard@brandlinkdc.com." Blakely Decl. ¶ 12. In fact, while that is one of the email addresses appearing in the various email chains, the actual names of Tucker and Clark — as well as their email addresses that use their actual names and the "brandlinkdc.com" extension — are used repeatedly in the emails. And it is not merely the case that email addresses with Tucker's and Clark's names appear in the to/from/cc fields. Instead, the text of the emails clearly identifies some of the emails as being authored by "Devin Tucker" and "Amy Clark" with the BrandLink name appearing in easily visible type underneath their names. The emails specifically identify Devin Tucker as a "Senior Public Relations Manager" at BrandLink, and identify Amy Clark as "VP of Public Relations" at BrandLink. Thus, Universal Standard's explanation that it was misled by the occasional use of the "universalstandard@brandlinkdc.com" email address is nonsensical.

In light of these facts, while counsel's error may have been "inadvertent[]," it was "inadvertent[]" only because the log entries for the documents at issue here were prepared without actually looking at the names and affiliations of the people who were sending and receiving the emails. The effect of this critical failure was that Target had no idea that it had a potential waiver argument based on the inclusion of the BrandLink employees on the emails.

While Target ended up not being prejudiced by Universal Standard's conduct, this came about only because of the happenstance that Target had subpoenaed BrandLink directly.

The lack of a reasonable explanation for the omissions on the privilege log error strongly suggests that this is a situation where there has been a "flagrant" violation of Local Rule 26.2 that should result in a waiver of any claim to privilege or protection under the work product doctrine. We elect not to reach this question, however, because, as described below, we conclude on the merits that the emails are not entitled to such protection.

C. <u>Attorney-Client Privilege</u>

1. <u>Governing Law</u>

Where evidence is "relevant to both the federal and state claims[,] . . . privileges are governed by the principles of federal law." <u>von Bulow v. von Bulow</u>, 811 F.2d 136, 141 (2d Cir. 1987) (citations omitted); <u>accord</u> <u>Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u>, 319 F.R.D. 100, 104 (S.D.N.Y. 2017); <u>La Suisse, Societe d'Assurances Sur La Vie v. Kraus</u>, 62 F. Supp. 3d 358, 363 n.3 (S.D.N.Y. 2014). Under federal common law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." <u>United States v. Mejia</u>, 655 F.3d 126, 132 (2d Cir. 2011) (citing <u>In re Cnty. of Erie</u>, 473 F.3d 413, 419 (2d Cir. 2007)); <u>accord</u> <u>United States v. Krug</u>, 868 F.3d 82, 86 (2d Cir. 2017); <u>Pearlstein v. BlackBerry Ltd.</u>, 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019); <u>Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg</u>, 171 F. Supp. 3d 136, 140 (S.D.N.Y. 2016). "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." <u>United States v. Ackert</u>, 169 F.3d 136, 139 (2d Cir. 1999) (quotation marks and citation omitted); <u>accord</u> <u>Stryker Corp. v. Intermedics Orthopedics, Inc.</u>, 145 F.R.D. 298, 301

(E.D.N.Y. 1992). Courts have emphasized that "[w]hile the privilege confers important social benefits, it also exacts significant costs" because "[i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." Application of Sarrio, S.A., 119 F.3d 143, 147 (2d Cir. 1997) (citation omitted); accord In re Bairnco Corp. Secs. Litig., 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that "the attorney-client privilege both advances and impedes the administration of justice"). Accordingly, courts apply the attorney-client privilege "only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." Mejia, 655 F.3d at 132 (quotation marks and citations omitted).

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, . . . a burden not discharged by mere conclusory or ipse dixit assertions." In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984) (quotation marks and citations omitted). The party invoking the privilege also has the burden to show that the privilege has not been waived. Wultz v. Bank of China Ltd., 304 F.R.D. 384, 391 (S.D.N.Y. 2015).

2. Analysis

The question here is whether the fact that emails between Universal Standard and its counsel were also shared with BrandLink should result in a waiver. Normally, as the Second Circuit has held, "disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed." In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973); accord Cicel (Beijing) Sci. & Tech. Co., Ltd. v. Misonix, Inc., 2019 WL 1574806, at *5 (E.D.N.Y. Apr. 11, 2019) ("voluntary disclosure of privileged communications to a third party results in waiver of the attorney-client privilege") (citations and internal punctuation and quotation marks omitted); La Suisse, Societe

9

d'Assurances Sur La Vie, 62 F. Supp. 3d at 363 (citing Ratliff v. Davis Polk & Wardwell, 354 F.3d 165, 170 n.5 (2d Cir. 2003)) ("The attorney-client privilege does not normally attach to privileged communications that are disclosed to persons who are neither the attorney nor the client."). The rationale for the waiver doctrine is that, as the Second Circuit has held, "it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence." See Mejia, 655 F.3d at 134 (quoting In re Horowitz, 482 F.2d at 81-82); accord Schaeffler v. United States, 806 F.3d 34, 40 (2d Cir. 2015) ("A party that shares otherwise privileged communications with an outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential.").

Notwithstanding this general rule, several lines of cases have developed in which courts have not found a waiver even where attorney-client communications were shared with a third party. One exception commonly applied involves communications with the attorney and a third party who has a common legal interest, sometimes referred to as the "common interest" doctrine or the "joint defense privilege." See, e.g., United States v. Krug, 868 F.3d 82, 86 (2d Cir. 2017). Though this doctrine is not at issue here, three other lines of cases reflecting exceptions to the general waiver rule have been cited by Universal Standard. These consist of: (1) cases in which the third party is deemed essential to allow communication between the attorney and the client, such as an interpreter or accountant, see, e.g., United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989); (2) cases involving communications between a third party and a corporation's attorney where the third party is deemed the "functional equivalent" of a corporate employee, see, e.g., In re Copper Market Antitrust Litigation, 200 F.R.D. 213, 216 (S.D.N.Y. 2001); and (3) cases involving "consultants used by lawyers to assist in performing [certain] tasks that go

beyond advising a client as to the law" — in particular, tasks that "promote broader public interests in the observance of law and administration of justice," In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 329 (S.D.N.Y. 2003).

As discussed below, none of these exceptions to the waiver doctrine apply here.

a. Third Party Necessary for Communication
   between Client and Counsel

In the first line cases, waiver is not found where the presence of a third party is needed to allow the client to communicate information to an attorney, such as where a translator is used or where an accountant supplies specialized knowledge to allow an attorney to understand the client's situation. See, e.g., Schwimmer, 892 F.2d at 243 ("Information provided to an accountant by a client at the behest of his attorney for the purposes of interpretation and analysis is privileged to the extent that it is imparted in connection with the legal representation."); United States v. Kovel, 296 F.2d 918, 921-22 (2d Cir. 1961) (noting that an attorney may use an interpreter to communicate with or take a statement from a client and not destroy any privilege); accord Cohen v. Cohen, 2015 WL 745712, at *3 (S.D.N.Y. Jan. 30, 2015) (Kovel applies "only to essential third parties, such as foreign language interpreters or accountants who can clarify complex financial issues directly related to the provision of legal advice"). This line of cases applies where the third party "[enables] counsel to understand aspects of the client's own communications that could not otherwise be appreciated." Calvin Klein Trademark Tr. v. Wachner, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).[3] Nonetheless, the Second Circuit has held that "a

---

[3] This line of cases evolved from the notion that the third party was acting as the attorney's agent. See La Suisse, Societe d'Assurances Sur La Vie, 62 F. Supp. 3d at 364. Case law has expanded this concept to encompass persons viewed as acting as the client's agent, as is described in the next section, and in some instances, even as agents of an individual client rather than a corporation. See id. (citing cases).

communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (citing Hickman v. Taylor, 329 U.S. 495, 508 (1947), and Colton v. United States, 306 F.2d 633, 639 (2d Cir. 1962)) (additional citation omitted). Rather, the third party's involvement must be "to improve the comprehension of the communications between attorney and client." Id. (attorney-client privilege was waived where the third party, an investment banker, was not acting "as a translator or interpreter of client communications").

This line of cases has no application here. Universal Standard did not need employees of BrandLink to communicate with their attorneys. The particular emails at issue involved discussions regarding a public relations strategy surrounding the filing of the instant lawsuit and in particular whether a press release should issue. See Def. Letter Motion at 1; Pl. Opp. at 5, 13; Veksler Decl. ¶ 8. Any questions that arose regarding the propriety of a press release, however, could simply have been communicated to the attorneys by Universal Standard without Brandlink's involvement. See, e.g., Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, 2014 WL 7238354, at *3 (S.D.N.Y. Dec. 19, 2014) ("Legal concerns expressed to the client need to be adopted by the client and then transmitted to the consultants as corporate concerns and policies independent of the explicit advice previously received.") (citation and bracketing omitted). Because BrandLink did not serve to improve counsel's understanding of Universal Standard's request for legal advice, Universal Standard cannot rely on this line of cases to establish a waiver exception. See, e.g., LG Elec. U.S.A., Inc. v. Whirlpool Corp., 661 F. Supp. 2d 958, 964 (N.D. Ill. 2009) ("Whirlpool does not contend that its in-house counsel cannot understand proposed advertisements and marketing plans without [advertising] agency

assistance—its counsel communicates directly with the agencies as a matter of expediency."); Calvin Klein Trademark Tr., 198 F.R.D. at 54 (outside public relations agency, "far from serving the kind of 'translator' function served by the accountant in Kovel . . . is, at most, simply providing ordinary public relations advice so far as the documents here in question are concerned"); see also Church & Dwight Co. Inc., 2014 WL 7238354, at *2 (to meet this exception, it must be shown that "the third party enabled counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice") (citation omitted).

b. The "Functional Equivalent" Exception

The second line of cases derives from the fact that any act of a corporation — including communications with an attorney — must necessarily be accomplished through an agent. See, e.g., La Suisse, Societe d'Assurances Sur La Vie, 62 F. Supp. 3d at 364 ("Corporations, after all, can only act through their agents.") (citations omitted). Addressing the issue of communications by corporate employees to attorneys, the Supreme Court in Upjohn Co. v. United States, 449 U.S. 383 (1981), held that attorney-client protection extends to communications from corporate employees who communicate with counsel "at the direction of corporate superiors in order to secure legal advice from counsel." Id. at 394. Upjohn provides guidance in determining when a corporate employee may properly be said to be acting as the corporation's agent for this purpose. Upjohn rejected the notion that only a high-level "control group" in a corporation could communicate with an attorney without the privilege being waived. Instead, it found that lower level employees could properly be used as agents of a corporation where they had "relevant information needed by corporate counsel if [counsel] is adequately to advise the client with respect to such actual or potential difficulties." Id. at 391. Upjohn emphasized that "[t]he

13

communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." Id. at 394.

Here, BrandLink is not a corporate employee. Even so, Universal Standard contends that the attorney-client privilege should not be considered waived because BrandLink was "the functional equivalent" of a Universal Standard employee. Pl. Opp. at 9-11. One case has identified the "functional equivalent" exception to privilege waiver as originating in In re Bieter Co., 16 F.3d 929, 933-34, 939-40 (8th Cir. 1994). See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., 352 F. Supp. 3d 207, 212-13 (E.D.N.Y. 2019). In Bieter, the Eighth Circuit considered whether the attorney-client privilege could apply to communications between an attorney and an individual who was an independent contractor, rather than employee, of the client company. 16 F.3d at 934. Bieter found the individual qualified as the "functional equivalent" of an employee because the company had a single purpose (to develop a parcel of land), the individual was hired to achieve that purpose, he had acted as the company's sole representative at a number of meetings relating to the development of the land, and he likely possessed information that was possessed by no one else at the company. Id. at 938. Bieter emphasized that the individual was "precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand [the company]'s reasons for seeking representation." Id.

Following Bieter, courts in this Circuit have recognized that "[c]ommunications between a company's lawyers and its independent contractor merit attorney-client privilege protection if, by virtue of assuming the functions and duties of a full-time employee, the contractor is a de facto employee of the company." Narayanan v. Sutherland Glob. Holdings Inc., 285 F. Supp. 3d

604, 615 (W.D.N.Y. 2018) (some bracketing omitted) (quoting Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., Ltd., 232 F.R.D. 103, 113 (S.D.N.Y. 2005)); accord In re Sampedro, 2019 WL 157092, at *4 (D. Conn. Jan. 10, 2019).  In determining whether the "functional equivalent" exception applies

> [c]ourts in this Circuit have considered the following factors, among others[:] . . . whether the consultant exercised independent decision-making on the company's behalf; possessed information held by no one else at the company; served as a company representative to third parties; maintained an office at the company or otherwise spent a substantial amount of time working for it; and sought legal advice from corporate counsel to guide his or her work for the company.

In re Restasis, 352 F. Supp. 3d at 213 (citing cases); see also Durling v. Papa John's Int'l, Inc., 2018 WL 557915, at *5 (S.D.N.Y. Jan. 24, 2018) (analyzing factors of independent authority, primary responsibility, and level of integration in the client's corporate hierarchy); accord Church & Dwight Co. Inc., 2014 WL 7238354, at *2; Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 2011 WL 4716334, at *3 (S.D.N.Y. Oct. 3, 2011).

Here, a co-founder of Universal Standard, Polina Veksler, states that BrandLink was hired by Universal Standard in or around February 2018 to serve as Universal Standard's "public relations arm."  Veksler Decl. ¶ 4.  Veksler asserts BrandLink had "certain" unspecified "independent decision-making authority regarding Universal Standards' public relations and public relations strategy," and that "Brandlink is responsible for handling Universal Standards' public relations needs."  Id.  The only specific information given on this point, however, is that BrandLink would "monitor and respond to any and all relevant inquiries" directed to an email address that was used "for public relations and press inquiries," id. ¶ 5 — duties that were unrelated to seeking legal advice.  Nonetheless, Veksler concedes that she communicates with BrandLink "several times a week on average."  Id. ¶ 6.  Importantly, Veksler does not suggest,

let alone state, that BrandLink had any independent authority to decide to issue a press release — and, in particular, to make the decision whether to issue a press release when the instant litigation was filed, which is the topic area of the disputed emails. She also does not suggest that BrandLink worked exclusively for Universal Standard. Instead, evidence in the record shows otherwise. See Def. Letter Motion, Ex. C (screen-shot from BrandLink's web-page indicating it provides services for over a dozen other brands).

Target has proffered evidence that as of April 2018, Universal Standard characterized its relationship with BrandLink as involving a six month contract "to test [BrandLink] out." Email message from Angela Brugioni, sent Apr. 9, 2018 (annexed as Ex. A to Def. Letter Motion, Docket # 90-1). Moreover, although Universal Standard asserts that BrandLink has "certain independent decision-making authority" regarding public relations, Veksler Decl. ¶ 4, the record suggests that any authority BrandLink possessed was not truly independent as to the question of issuing a press release. In a June 2018 email exchange between two BrandLink employees, one employee noted that Universal Standard would "not back down and disagree[s] w[ith] our recommendation to not issue a [press] release" regarding Universal Standard's lawsuit against Target. Email message from Amy Clark, sent June 19, 2018 (annexed as Ex. 1 to Popkin Decl.). That Universal Standard purportedly agreed with BrandLink to not issue the press release, see Veksler Decl. ¶ 8, does not demonstrate that BrandLink possessed independent decision-making authority.[4] In another email, as to whether BrandLink could share the Target litigation press release with a publication, one BrandLink employee cautioned another that BrandLink should

---

[4] Target has provided evidence that either BrandLink or Universal Standard in fact did send a press release to one entity. See Exhibits 2 and 7 annexed to Popkin Decl. (email exchange discussing publicizing the press release, and the eventual article that was published online concerning the lawsuit).

"run it by" Universal Standard beforehand.  See Email messages from Devin Tucker and Barbara Martin, sent July 9, 2018 (annexed as Ex. 2 to Popkin Decl.).  These emails suggest that any decision-making authority BrandLink possessed was very limited.  Certainly, there is no evidence that BrandLink "possessed information held by no one else at [Universal Standard]," that BrandLink "maintained an office at [Universal Standard] or otherwise spent a substantial amount of time working for [Universal Standard]," or that BrandLink "sought legal advice from corporate counsel to guide [its] work for the company."  In re Restasis, 352 F. Supp. 3d at 213.

It is of no great significance that, as Universal Standard argues, BrandLink has "particular and unique expertise in the area of public relations, whereas Universal Standard does not," or that BrandLink "works closely with Universal Standard's owners on a continuous basis regarding PR issues."  Pl. Opp. at 11.  In the end, Universal Standard has not shown that BrandLink "perform[ed] functions materially different from those that any ordinary public relations firm would have performed."  Calvin Klein Trademark Tr., 198 F.R.D. at 55.  To the contrary, the evidence presented by the parties "contradict[s] the picture of [BrandLink] as so fully integrated into the [Universal Standard] hierarchy as to be a de facto employee of [Universal Standard]."  Exp.-Imp. Bank of the U.S., 232 F.R.D. at 114; see, e.g., Durling, 2018 WL 557915, at *5 (party failed to establish functional equivalent exception in part due to a lack of independent decision-making authority, primary responsibility, and because the company had "numerous" other customers); see also Homeward Residential, Inc. v. Sand Canyon Corp., 2017 WL 4676806, at *14 (S.D.N.Y. Oct. 17, 2017) ("Businesses routinely rely on other companies to carry out important functions and services[] . . . .  If this relationship satisfied the functional equivalent standard, the exception could well swallow the rule.").

Universal Standard relies on several cases to support its contention that BrandLink

should be considered the functional equivalent of a Universal Standard employee, see Pl. Opp. at 9-11, but all involved far different factual circumstances. In re Copper Market Antitrust Litigation, 200 F.R.D. 213 (S.D.N.Y. 2001), involved a foreign corporation that suddenly became involved in "high profile litigation," whose principals did not speak English well and "lacked experience in dealing with the Western media." Id. at 215. The third party public relations consultant was "essentially, incorporated into [the foreign corporation]'s staff to perform a corporate function that was necessary in the context of the government investigation." Id. at 219. The consultant also "possessed authority to make decisions on behalf of [the foreign corporation] concerning its public relations strategy." Id. Thus, the public relations consultant "was the functional equivalent of an in-house public relations department with respect to Western media relations, having authority to make decisions and statements on [the foreign corporation]'s behalf, and seeking and receiving legal advice from [the foreign corporation]'s counsel with respect to the performance of its duties." Id. at 216.

Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 2002 WL 31556383 (S.D.N.Y. Nov. 15, 2002), involved a movie studio that conducted its business "through the use of independent contractors" rather than employees, which was "a result of the sporadic nature of employment in the motion picture industry." Id. at *2. Here, the public relations function was not entirely outsourced to BrandLink. Rather, BrandLink's work was supervised in important respects by Universal Standard.

Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., 232 F.R.D. 103 (S.D.N.Y. 2005), also relied on by Universal Standard, actually found a waiver because it had not been proven that the independent contractor was "so fully integrated into the [client's] hierarchy as to be a de facto employee of" the client. Id. at 114.

Thus, the cases cited by Universal Standard do not support its argument as to waiver.[5] Instead, we find that the numerous cases finding waiver where there have been disclosures to third parties more aptly fit the circumstances here. See, e.g., In re Restasis, 352 F. Supp. 3d at 214-15 (consultants were engaged through "routine consulting agreements," possessed expertise that "supplemented the knowledge of others at" the corporation, did not exercise "any independent decision-making," "worked out of their own offices" and "likely served as consultants for other companies," and were not "so integrated into [the] corporate structure that [they] sought and received legal advice from [the corporation]'s counsel"); Lynx Sys. Developers, Inc. v. Zebra Enter. Sols. Corp., 2018 WL 1532614, at *4 (D. Mass. Mar. 28, 2018) (non-employee consultants "did not have longstanding relationships with [the client], were paid hourly, worked from their own locations, were not obligated to work exclusively for [the client], and did not act as [the client]'s sole representatives"); Homeward Residential, 2017 WL 4676806, at *14 (data storage and management firm "was not given primary responsibility for a key corporate job," was "an independent company that provides services and technology to multiple clients," and where the firm's "role in storing and managing data for [the client] did not integrate it into [the client]'s 'corporate structure'") (citation omitted); Church & Dwight Co. Inc., 2014 WL 7238354, at *3 (public relations firm did not have "primary responsibility for a

_____

[5] Universal Standard also cites cases from outside the Second Circuit. Because they apply different tests and principles, we do not find them relevant. We note merely that in F.T.C. v. GlaxoSmithKline, 294 F.3d 141 (D.C. Cir. 2002), it was found that "corporate counsel worked with [the third party] consultants in the same manner as they did with full-time employees." Id. at 148. Indeed, the court noted that "the consultants acted as part of a team with full-time employees regarding their particular assignments and, as a result, the consultants became integral members of the team assigned to deal with issues that were completely intertwined with GSK's litigation and legal strategies." Id. (quotation marks and alterations omitted). The privilege issue in Hadjih v. Evenflo Co., 2012 WL 1957302 (D. Colo. May 31, 2012), was governed by Colorado law. Id. at *2.

key corporate job," "was not hired as part of a litigation strategy to assist a foreign company completely unfamiliar with how to handle local media," and was not "likely to possess information possessed by no one else at the company") (citations and quotation marks omitted); see also Narayanan, 285 F. Supp. 3d at 617 (functional equivalent exception did not apply where the client, not the accounting/consulting firm, "retained the authority to make decisions," and where the consultant was hired by the client "to conduct a fact-gathering investigation and to propose recommendations concerning internal controls to [the client], not to decide whether to adopt them") (emphasis omitted); cf. In re Sampedro, 2019 WL 157092, at *4-5 (no waiver where non-lawyer advisors "served as the primary liaison with external counsel on [specific] matters" and "assist[ed] outside counsel in the defense of [an] arbitration and litigation . . . and in conducting internal investigations into the matters relating to the disputes") (quotation marks and citations omitted).

### c.  Consultants Used by Lawyers To Aid In Legal Tasks

The third line of cases is best exemplified by In re Grand Jury Subpoenas Dated Mar. 24, 2003, 265 F. Supp. 2d 321 (S.D.N.Y. 2003).  That case involved a high profile target of a criminal investigation.  See id. at 322-23.  The target's attorney determined that a public relations firm should be engaged to conduct a media campaign in an effort to paint the target in a favorable light so that the prosecutors might feel less pressure to indict.  Id. at 323-24.  The court found that the engagement of the public relation firm was necessary for the lawyers "to perform some of their most fundamental client functions—such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication."  Id. at 330.  In other words, the public relations function being performed —

characterized as a "lawyer's public advocacy on behalf of the client," id. at 329 — was necessary to achieve a circumscribed litigation goal: specifically, influencing the decision whether or not to indict.  The court limited its holding to situations where a public relations consultant was "hired by the lawyers to assist them in dealing with the media in cases such as this," and where the communications "are made for the purpose of giving or receiving advice . . . directed at handling the client's legal problems."  Id. at 331.

That is a far cry from the situation here.  The public relations consultant here was hired not by the attorney but by Universal Standard and was hired for business purposes.  See, e.g., Veksler Decl. ¶ 6 ("Since Brandlink was hired in February 2018, they have acted as the de facto public relations arm of Universal Standard and I have relied upon Brandlink to handle public relations issues and tasks.").  There is no evidence that the purpose of the communications with BrandLink was to assist counsel in engaging in a legal task as opposed to allowing Universal Standard to make a decision about the nature of publicity that should be sought.  The situation here is thus missing the critical element from In re Grand Jury Subpoenas Dated March 24, 2003: attorneys using a public relations consultant to implement a specific legal strategy that required the use of a public relations consultant.  See generally Bloomingburg Jewish Educ. Ctr., 171 F. Supp. 3d at 147 ("unlike In re Grand Jury Subpoenas Dated March 24, 2003, here . . . Defendants have not shown that counsel needed [the public relations and marketing firm] for any purpose other than communicating with the general public at large");  McNamee v. Clemens, 2013 WL 6572899, at *6 (E.D.N.Y. Sept. 18, 2013) (noting that "facilitat[ing] the development of a public relations campaign and media strategy primarily aimed at protecting [a client's] public image and reputation" is "decidedly different from the use of the public relations firm in In re Grand Jury Subpoenas");  Ravenell v. Avis Budget Grp., Inc., 2012 WL 1150450, at

*3 (E.D.N.Y. Apr. 5, 2012) ("The reach of [In re Grand Jury Subpoenas Dated March 24, 2003 is] limited by its context: the Court couched its finding in the narrow scenario of public relations consultants assisting lawyers during a high profile grand jury investigation."); In re Chevron Corp., 749 F. Supp. 2d 170, 184 n.64 (S.D.N.Y.) (interpreting In re Grand Jury Subpoenas Dated March 24, 2003 as having a "very narrow holding" and being applicable only in "cases such as . . . high profile grand jury investigation[s]"), aff'd 409 F. App'x 393 (2d Cir. 2010); see also Haugh v. Schroder Inv. Mgmt. N. Am. Inc., 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("Plaintiff has not shown that [the public relations specialist] performed anything other than standard public relations services . . . [and] has not shown that her communications . . . were necessary so that [the lawyer] could provide [plaintiff] with legal advice.").

    D.  Work Product Doctrine

    Federal law governs the applicability of the work product doctrine.  See, e.g., Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008) (citing Weber v. Paduano, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003)); accord Egiazaryan v. Zalmayev, 290 F.R.D. 421, 435 (S.D.N.Y. 2013).  The work product doctrine is codified in Rule 26 of the Federal Rules of Civil Procedure, which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party makes a showing of substantial need "and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3).  The purpose of the work product rule is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman, 329 U.S. at 510-11).  The work product doctrine protects

materials prepared not only by attorneys but also by their agents.  Costabile v. Westchester, N.Y., 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (citing cases).

Under Rule 26(b)(3), the party asserting work product protection "bears the burden of establishing its applicability to the case at hand."  In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (citing cases).  The party asserting work-product protection must demonstrate that the material at issue "'(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.'"  Allied Irish Banks, P.L.C., 252 F.R.D. at 173 (quoting Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 105 (S.D.N.Y. 2007)); accord Au New Haven, LLC v. YKK Corp., 2018 WL 333828, at *2 (S.D.N.Y. Jan. 5, 2018); Nalco Co. LLC v. Pall Corp., 2017 WL 1535384, at *2 (S.D.N.Y. Apr. 13, 2017); Obeid v. Mack, 2016 WL 7176653, at *4 (S.D.N.Y. Dec. 9, 2016).  Importantly, the materials to be protected "must result from the conduct of investigative or analytical tasks to aid counsel in preparing for litigation."  Wultz, 304 F.R.D. at 393–94 (citation and internal quotation marks omitted).

Here, after giving a generic recitation of law governing work product doctrine, Universal Standard's argument that the doctrine applies in this matter is confined to a single sentence. That sentence states: "Here, the documents in question were not only prepared in anticipation of litigation, they reflect the opinions of Universal Standard's counsel and [are] clearly protected by the work-product privilege."  Pl. Opp. at 19.  This argument, however, is simply a conclusory recital of the governing test.  It does nothing to show that the test applies here.  Accordingly, we reject any claim to protection from the work product doctrine for this reason alone.

Additionally, we note that many cases have rejected work product protection for material relating to public relations activities.  See, e.g., Calvin Klein Trademark Tr., 198 F.R.D. at 55

("[T]he purpose of [Rule 26(b)(3)] is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally.") (citations omitted); Chevron Corp. v. Salazar, 2011 WL 3880896, at *1 (S.D.N.Y. Sept. 1, 2011) (public relations consultant's analysis of the public reaction to a court judgment is not protected as work product); Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 78 (S.D.N.Y. 2010) (work product doctrine was inapplicable to a "publicity strategy [that] was treated as a business concern"); N.Y. Times Co. v. U.S. Dep't of Def., 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007) ("talking points" document was not work product under an exemption pursuant to the Freedom of Information Act because it "seem[ed] to have been drafted for public relations purposes"). Our own review of the emails here reflects that they relate to Universal Standard's decision whether to publicize the litigation through a press release to be prepared by BrandLink, not "investigative or analytical tasks to aid counsel in preparing for litigation." Wultz, 304 F.R.D. at 394.

*     *     *

In sum, the Court concludes that Universal Standard has not met its burden to demonstrate that the communications at issue are subject to the attorney-client privilege or are protected by the work product doctrine.[6] Obviously, this ruling should not be construed to have any bearing on the admissibility of the documents at issue.

---

[6] Citing case law and state and American Bar Association ethics rules, Universal Standard argues that "Target's conduct regarding these privileged emails should not be condoned," Pl. Opp. at 19 (capitalization omitted), and suggests that because Target did not "notify Plaintiff's counsel that they were in possession of attorney-client communications," id. at 20, sanctions, possibly "disqualification" of Target's counsel, may be appropriate, see id. at 20-21. We reject this application because it is premised on the assumption that Target knew or should have known that the documents were privileged. For the reasons stated in this Opinion and Order, that premise is not well-founded.

## III. CONCLUSION

For the foregoing reasons, Target's motion (Docket # 90) requesting that the Court rule

that the documents at issue in this matter are neither privileged nor protected by the work

product doctrine is granted.

SO ORDERED.

Dated: New York, New York
       May 6, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

25